```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
                  EASTERN DIVISION


CLARINET, LLC,                      )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     No. 4:10 CV 1686 DDN
                                    )
ESSEX INSURANCE COMPANY,            )
                                    )
            Defendant.              )
```

**MEMORANDUM**

This action is before the court on the motions of plaintiff Clarinet, LLC for partial summary judgment as to coverage (Doc. 37) and of defendant Essex Insurance Company for summary judgment (Doc. 40). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 13.) Oral arguments were heard on October 17, 2011.

**I.   BACKGROUND**

On July 20, 2010, plaintiff Clarinet, LLC commenced this action against defendant Essex Insurance Company in the Circuit Court of the City of St. Louis, Missouri. (Doc. 1-1.) On September 10, 2010, Essex removed the action to this court pursuant to 28 U.S.C. § 1441, based on diversity of citizenship subject matter jurisdiction, 28 U.S.C. § 1332. (Doc. 1 at ¶ 1.)

According to the complaint, Essex denied coverage under an insurance contract with Clarinet (Policy) for stabilization and demolition costs incurred by Clarinet when the Switzer Building was damaged by a windstorm (Storm). Clarinet raises three claims for relief in its complaint. (Doc. 1-1 at ¶ 36.) In Count I, it alleges that it is entitled to a declaratory judgment that the costs associated with shoring, stabilizing, and demolishing the Switzer Building are covered under the Policy. (Id. at ¶¶ 37-40.) In Count II, it alleges that Essex breached the Policy by denying coverage for the shoring, stabilization, and demolition costs. (Id. at ¶¶ 41-45.) In Count III, it alleges that Essex's refusal to

provide coverage was vexatious, made in bad faith, and without reasonable cause. (Id. at ¶¶ 46-51.) Clarinet seeks monetary damages for the costs it incurred in shoring, stabilizing, and demolishing the Switzer Building, plus interest, costs, penalties, and attorney's fees. (Id. at ¶¶ 40, 45, 51.)

## II. MOTIONS FOR SUMMARY JUDGMENT

Clarinet argues that it is entitled to partial summary judgment on the issue of coverage because the Storm and damage to the Switzer Building were "occurrences" under the Policy. Clarinet argues that no Policy exclusions apply because the City of St. Louis (City) ordered demolition, because the Switzer Building threatened immediate damage to City property, and because partial collapse of the Switzer Building was caused by the Storm. Clarinet further argues that its failure to seek Essex's consent before incurring the costs was immaterial and that the vacancy of the Switzer Building should not preclude coverage. (Docs. 38, 42, 45.)

Essex argues that it is entitled to summary judgment because there was no "occurrence" under the Policy and because Clarinet was not "legally obligated" to incur the costs. Essex also argues that certain Policy exclusions apply because the costs were related to Clarinet's property and were incurred to prevent future damage to third parties. Essex further argues that demolition and construction costs and damage to rented and leased equipment are excluded, and that Clarinet's failure to give notice before agreeing to incur the costs precludes coverage. (Docs. 41, 44, 47.) Essex seeks a determination by the court that there is no coverage under the Policy, and that it has no duty to indemnify Clarinet, for the stabilization and demolition costs incurred by Clarinet. (Doc. 40, at 3.)

## III. STATEMENT OF UNDISPUTED FACTS

In 2005, Clarinet purchased real property located at 612 N. 1st Street in the City of St. Louis, Missouri, which was formerly known as the Switzer Building. (Doc. 41-1 at ¶ 1.) The Switzer Building was a turn-of-the-century masonry structure, consisting of six stories above

grade, one story below grade, and an annex building. (Doc. 39 at ¶ 3.) It was listed as an historical building with the National Register of Historic Places as part of the Laclede's Landing Historic District. (Id. at ¶ 4.) Clarinet purchased the Switzer Building with the intent to develop it into luxury condominiums, street level retail stores, and commercial space. (Id. at ¶ 2; Doc. 41-1 at ¶ 2.)

The Policy

On July 7, 2006, Essex issued a Commercial General Liability Policy (Policy No. 3CM5800) to Clarinet, effective July 7, 2006 through October 7, 2006. (Doc. 41-1 at ¶ 3; Doc. 41-3; Doc. 41-4). Essex issued renewal policies to Clarinet, the last of which was effective April 24, 2007 through July 24, 2007 (Policy No. 3CV2139). (Doc. 39 at ¶ 6.) Clarinet paid all premiums that were due. (Id. at ¶ 7.) The Policy provided the following coverage:

    **Section I - COVERAGES**

    **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1. Insuring Agreement**

    a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that might result.

       (1)   The amount we will pay for damages is limited as described in Section III - Limits of Insurance; and

       (2)   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

>      No other obligation or liability to pay sums or
>      perform acts or services is covered unless
>      explicitly provided for under Supplementary
>      Payments - Coverages A and B.
>
> b.  This insurance applies to "bodily injury" and "property
> damage" only if:
>
>      (1)  The "bodily injury" or "property damage" is
>      caused by an "occurrence" that takes place in the
>      "coverage territory";
>
>      (2) The "bodily injury" or "property damage" occurs
>      during the policy period; . . .
>
>                          * * *

(Doc. 41-3 at 18.)

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 30.) The Policy defines "property damage" as:

> a.  Physical injury to tangible property, including all
>     resulting loss of use of that property. All such loss
>     of use shall be deemed to occur at the time of the
>     physical injury that caused it; or
>
> b.  Loss of use of tangible property that is not physically
>     injured. All such loss of use shall be deemed to occur
>     at the time of the "occurrence" that caused it.

(Id. at 30, 31.)

Coverage under the Policy is limited by exclusions, including:

**2. Exclusions**

> This insurance does not apply to:
>
> a.  **Expected Or Intended Injury**
>
>      "Bodily injury" or "property damage" <u>expected or
>      intended from the standpoint of the insured</u>. This
>      exclusion does not apply to "bodily injury"
>      resulting from the use of reasonable force to
>      protect persons or property.
>
> j.  **Damage To Property**
>
>      "Property damage" to:

- 4 -

>> (1) <u>Property you own, rent</u>, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, <u>including prevention of injury to a person or damage to another's property</u>;
>
> * * *
>
>> (3) Property loaned to you;
>
>> (4) Personal property in the care, custody or control of the insured;
>
> * * *

(<u>Id.</u> at 18-21) (emphasis added).

Coverage under the Policy is also limited by other provisions:

VACANT BUILDING ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.

This policy does not provide insurance coverage or defense for claims, loss, costs, and/or expenses for claims arising from any <u>renovation, demolition, or construction operations</u> or any owner or tenant occupancy at any building, or part of a building, classified on this policy as <u>vacant</u>.

* * *

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

* * *

**2.  Duties In The Event Of Occurrence, Offense, Claim Or Suit**

* * *

> d.  No insured will, except at that insured's own cost, <u>voluntarily</u> make a payment, assume any obligation, or incur any expense, other than for first aid, <u>without our consent</u>.

(<u>Id.</u> at 17, 26, 27) (emphasis added).

- 5 -

In a Commercial General Liability Coverage Part Supplemental Declarations form, the Switzer Building was listed as "VACANT BUILDING - NOT FACTORIES." (Id. at 5; Doc. 41-4.)

### The Windstorm

On July 19, 2006, a severe windstorm struck the City of St. Louis. (Doc. 41-1 at ¶ 15.) The Storm caused a portion of the Switzer Building to collapse. (Id.) Specifically, the Storm destroyed portions of the south and east walls; destroyed substantial portions of the roof and the floor; and shifted or destroyed interior structural members. (Doc. 39 at ¶ 18; Doc. 39-3, Forsyth Aff. at ¶ 4.) The Storm left large portions of the east and north walls unsupported and exposed the interior of the Switzer Building to the weather, thereby causing continued deterioration. (Doc. 39 at ¶¶ 19, 20.) The partially-destroyed south wall was immediately adjacent to the Eads Bridge and an electrical substation, which were owned by the City. (Id. at ¶ 21; Doc. 41-1 at ¶ 30.) The Storm blew bricks and debris from the Switzer Building onto and near the Eads Bridge, thereby damaging the Bridge and the substation. (Doc. 39 at ¶ 16.)

After the Storm, Clarinet began efforts to stabilize the Switzer Building. (Doc. 41-1 at ¶ 16.) These efforts included installing 20 aluminum bracing towers, bracing between the Switzer Building and the Eads Bridge, and netting on the outside of the Switzer Building to prevent bricks and other debris from falling onto the Bridge or other adjacent property. (Id. at ¶ 16; Doc. 39 at ¶ 23.) Clarinet's stabilization and shoring efforts continued over several months. (Doc. 41-1 at ¶ 17.) Clarinet, through its agent, Richard Darragh, leased additional stabilization equipment from Patent Construction under the account of "VM Contracting." (Id. at ¶ 18, Doc. 41-6 at ¶ 6.)

### Demolition

Some time prior to June 6, 2007, Clarinet decided to demolish the Switzer Building. (Doc. 46 at ¶ 43.) On January 23, 2007, Clarinet entered into a demolition contract with Paric Corporation. (Doc. 39 at ¶ 36; Doc. 41-1 at ¶ 19; Doc. 41-7.) Because the Switzer Building was

listed as an historic landmark, Clarinet had to obtain approval from various City agencies before demolition. (Doc. 39 at ¶ 27.) On March 6, 2007, Clarinet, through Bill Buell of Premier Demolition, applied for a permit from the City to machine-wreck the Switzer Building. (Doc. 41-1 at ¶ 20; Doc. 41-8.) Clarinet informed the City that it could not abate the dangerous condition of the Switzer Building, and that demolition of the Switzer Building and adjacent structures was necessary. (Doc. 39 at ¶ 29.) On March 8, 2007, Darragh gave permission to Premier Demolition to demolish the Switzer Building. (Doc. 41-1 at ¶ 21; Doc. 41-9.) On May 10, 2007, the City gave permission that the Eads Bridge be closed from May 14, 2007 through May 23, 2007 to demolish the Switzer Building. (Doc. 41-1 at ¶ 22; Doc. 41-10.) On May 10, 2007, Darragh accepted the City's terms and conditions for granting the demolition permit. (Doc. 41-1 at ¶ 23; Doc. 41-11.)

On May 11, 2007, Clarinet notified Essex that bricks and debris had fallen from the Switzer Building and caused damage to the Eads Bridge. (Doc. 41-1 at ¶ 30; Doc. 46 at ¶ 44.)

On June 6, 2007, the City issued Clarinet a Notice of Emergency Condemnation, which required immediate demolition of the Switzer Building to abate dangers to persons and third-party property, including the Eads Bridge and other City property. (Doc. 41-1 at ¶ 25; Doc. 41-12; Doc. 39 at ¶ 30.) The Notice explained that the City had inspected the Switzer Building and determined that demolition was required because it could not be made safe. (Doc. 39 at ¶ 31.) Three years prior, on August 27, 2004, the City had issued a Notice of Condemnation to the prior owner of the Switzer Building, Jumer's of St. Louis Inc., ordering Jumer's to repair or remove the Switzer Building no later than September 7, 2004. (Doc. 41-1 at ¶ 26; Doc. 41-13.)

On June 18, 2007, demolition of the Switzer Building was complete. (Doc. 41-1 at ¶ 27.) Essex did not learn of the demolition until sometime after demolition was complete. (Id. at ¶ 31.) The stabilization and shoring equipment that had been installed in the Switzer Building was not removed prior to demolition. (Id. at ¶ 28.) Clarinet was charged $184,205.34 by Patent Construction for the

demolition.  (Id. at ¶ 29; Doc. 41-15.)  The total demolition costs exceeded $660,000.  (Doc. 39 at ¶ 36.)

On December 31, 2008, the City commenced an action against Clarinet and its members for damage from the bricks and debris falling onto and near the Eads Bridge.  (Id. at ¶ 37.)  Essex is defending Clarinet in this action.  (Id. at ¶ 38.)  However, Essex has denied coverage for Clarinet's stabilization and demolition costs.  (Id. at ¶ 39.)

### IV.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party.  Rademacher v. HBE Corp., 645 F.3d 1005, 1010 (8th Cir. 2011).  The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 379 (2007).

Initially, the moving party must demonstrate the absence of an issue for trial.  Celotex, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings or in general denials of the movant's assertions, but must instead proffer admissible evidence that demonstrates a genuine issue of material fact.  Fed. R. Civ. P. 56(e); Conseco Life Ins. Co. v. Williams, 620 F.3d 902, 910 (8th Cir. 2010); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800-01 (8th Cir. 2004).

### V.  DISCUSSION

The parties agree that Missouri law applies in this diversity case. Under Missouri law, the interpretation of an insurance contract is a question of law.  Schmitz v. Great Am. Assur. Co., 337 S.W.3d 700, 705 (Mo. 2011) (en banc).  When interpreting insurance contract terms, the

court should apply meanings understood by ordinary people purchasing the insurance. Id. at 705-06. The court should interpret the policy "so as to afford rather than defeat coverage." Murray v. Am. Fam. Mut. Ins. Co., 429 F.3d 757, 764 (8th Cir. 2005) (citation omitted) (applying Missouri law). Ambiguities in the insurance contract must be construed against the insurer. Id. However, if the policy is unambiguous, the court should enforce the policy according to its terms. Schmitz, 337 S.W.3d at 706. The insured bears the burden of proving coverage, while the insurer bears the burden of establishing the applicability of an exclusion. State Farm Mut. Auto. Ins. Co. v. Stockley, 168 S.W.3d 598, 600 (Mo. Ct. App. 2005).

**A. Coverage under the Policy**

Clarinet asserts that it is entitled to coverage for the stabilization and demolition costs because the Policy provides coverage when Clarinet becomes "legally obligated" to pay for "property damage" caused by an "occurrence." (Doc. 41-3 at 18.) Essex challenges whether the property damage was caused by an "occurrence" and whether Clarinet was "legally obligated" to incur the costs.[1]

The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 41-3 at 30.) The Policy does not define "accident." When an insurance policy is silent as to the meaning of a term or phrase, Missouri courts look to the plain meaning of the term or phrase, "as it would have been understood by an ordinary person of average intelligence when buying the policy." Jones v. Mid-Century Ins. Co., 287 S.W.3d 687, 690 (Mo. 2009) (en banc). In the absence of a definition within the policy, Missouri courts have defined "accident" broadly as:

> An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. Hence, often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as, to die by accident.

---

[1]Essex does not challenge whether the stabilization and demolition costs were "property damage" within the meaning of the Policy.

Columbia Mut. Ins. Co. v. Epstein, 239 S.W.3d 667, 672 (Mo. Ct. App. 2007) (citation omitted); Am. States Ins. Co. v. Mathis, 974 S.W.2d 647, 650 (Mo. Ct. App. 1998). "The focus of the definition is the insured's foresight or expectation of the injury or damages." Epstein, 239 S.W.3d at 672.

Clarinet asserts that three possible "occurrences" caused it to incur the stabilization and demolition costs: (1) the Storm, (2) the partial collapse of the Switzer Building, and (3) the dangerous nature of the Switzer Building following the Storm. Essex argues that these were not "occurrences" because they were not caused by Clarinet's negligence, which Essex contends is necessary to be an "occurrence."

In defining the scope of coverage, the Policy does not expressly require a negligent act by Clarinet to be the cause of the property damage; the express Policy language is broad enough to include damages not directly caused by Clarinet's acts. (Doc. 41-3 at 18.) The absence of an express requirement of negligence in the Policy's defined coverage suggests that the court should not construe the scope of coverage so narrowly. See Lupo v. Shelter Mut. Ins. Co., 70 S.W.3d 16, 21 (Mo. Ct. App. 2002) (noting that "the function of [the] court is to interpret and enforce an insurance policy as written; not to rewrite the contract").

The Policy at issue is a commercial general liability policy. Generally, commercial general liability policies are designed "to protect the insured against losses to third parties arising out of the operation of the insured's business," that is, "to provide coverage to the insured for tort liability for physical injury to the person or property of others." 9A Couch on Insurance §§ 129:2, 129:4 (3d ed. 2011); see also id. at § 129:1 ("[A] commercial general liability insurance policy is generally designed to provide coverage for tort liability for physical damages to others . . . ."). For this reason, for example, a commercial general liability policy would not cover faulty workmanship that damages the insured's product, but would cover damage or injury to a third party if caused by the faulty workmanship. See id. at § 129:4.

Essex argues that an "occurrence" must be caused, at least in part, by the insured's own negligent conduct. See Stark Liquidation Co. v. Florists Mut. Ins. Co., 243 S.W.3d 385, 393 (Mo. Ct. App. 2007)

- 10 -

(recognizing that "when a liability policy defines occurrence as meaning accident[,] Missouri courts consider this to mean injury caused by the negligence of the insured" and that an "accident" is "an occurrence arising from the carelessness of [people]" (citation omitted)); see also Wood v. Safeco Ins. Co. of Am., 980 S.W.2d 43, 50 (Mo. Ct. App. 1998) (noting that "[a] liability policy is designed to protect the insured from fortuitous injury caused by his actions" (citation omitted)).

Stark and Wood stand for the proposition that commercial general liability policies generally provide coverage for an insured's negligent acts as opposed to an insured's voluntary acts. See, e.g., J.E. Jones Constr. Co. v. Chubb & Sons, Inc., 486 F.3d 337, 341 (8th Cir. 2007) (applying Missouri law) (holding that "because the performance of a contract is within the insured's control, a breach of that contract cannot qualify as an 'accident' and therefore cannot be an occurrence.").

Clarinet does not allege that it incurred the stabilization and demolition costs because of its own negligent act; the Storm was not caused by Clarinet's conduct, negligent or otherwise, and the Storm caused the partial collapse of the Switzer Building, which resulted in danger to third-party property.

Missouri courts have not directly addressed whether an event such as a storm, partial collapse of a building, or sudden threat to third-party property constitutes an occurrence. Some authority exists, however, supporting Clarinet's position that the Storm was an "occurrence." See Interstate Fire & Cas. Co. v. B.T. Washington, Inc., CIV. A. No. 94-232, 1995 WL 273643, at *2 (E.D. Pa. May 5, 1995) (holding that a fire, which caused structural damage to a building that ultimately required demolition because of the damage, was arguably an "occurrence" for which the demolition costs could be covered under the policy);[2] but see Albuquerque Gravel Prods. Co. v. Am. Emp. Inso. co., 282 F.2d 218, 221 (10th Cir. 1960) (holding that flood damage was not caused by an

---

[2]Although the policy at issue in Interstate Fire & Cas. Co. was a "comprehensive general liability policy," this term is "often used interchangeably" with the term "commercial general liability policy." See Berletta Heavy Div., Inc. v. Layne Christensen Co., Civil Action No. 07-12084-DPW, 2011 WL 1399692, at *12 n.11 (D. Mass. Apr. 13, 2011); 9A Couch on Insurance § 129:1 (3d ed. 2011).

"accident" because although the flooding was more extensive than in the past, it was a "normal consequence" and not "unforeseeable"). Alternatively, some courts have held that acts undertaken to prevent damages that would be covered under the policy, although not otherwise covered, are themselves covered under the liability policy. See, e.g., State v. Allstate Ins. Co., 201 P.3d 1147, 1160 (Cal. Sup. Ct. 2009) (recognizing that "[l]iability policies have been held to cover damages resulting from an act undertaken to *prevent* a covered source of injury from coming into action, even if that act would otherwise not be covered.").

As discussed further below, the Policy contains an "owned property" exclusion, which expressly excludes from coverage property damage to property Clarinet owns or rents, including "any costs or expenses incurred by [Clarinet] . . . for any reason, including prevention of injury to a person or damage to third party another's property." (Doc. 41-3 at 18, 21.) That the Policy contains this express exclusion suggests that these costs would otherwise come within the Policy's defined scope of coverage. See generally Long v. Shelter Ins. Cos., 351 S.W.3d 692, 700 (Mo. Ct. App. 2011) ("A court must interpret policy provisions not in isolation but as a whole.").

The court need not resolve this issue, however, because assuming the stabilization and demolition costs were covered under the Policy,[3] Essex

---

[3]The parties also dispute another aspect of coverage: whether Clarinet was "legally obligated" to incur the stabilization and demolition costs. There are issues of fact, however, concerning whether the City ordered Clarinet to demolish the Switzer Building prior to Clarinet entering into the demolition contract and if so, what the nature of that order was. (Doc. 44 at ¶¶ 26, 33.) See Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 509 (Mo. 1997) (en banc) (holding that "Farmland's cost of undertaking the actions required by the government . . . [was] a cost that Farmland [was] legally obligated to pay as compensation or satisfaction for a wrong or injury"). Whether this demand would make Clarinet "legally obligated" to incur the stabilization and demolition costs is unclear. See King Louie Bowling Corp. of Mo. v. Mo. Ins. Guar. Assoc., 735 S.W.2d 35, 40-41 (Mo. Ct. App. 1987) (holding that voluntary settlements did not satisfy the "legally obligated" requirement). Given this fact dispute and because coverage is ultimately precluded by Policy exclusions, the court need not resolve
(continued...)

is entitled to summary judgment because Policy coverage is precluded by certain Policy exclusions.

**B.  Exclusions**

Essex argues that even if costs incurred to prevent or mitigate damage to third-party property are covered under the Policy, the stabilization and demolition costs are nonetheless excluded from coverage by certain Policy exclusions.

Essex first argues that the "owned property" exclusion precludes coverage.  This exclusion removes coverage for property damage to:

> (1) <u>Property you own, rent</u>, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, <u>including prevention of injury to a person or damage to another's property</u>;

(Doc. 41-3 at 18, 21) (emphasis added).

Essex argues that the property damage which Clarinet seeks to recover was damage to its own property, the Switzer Building, and damage to property that it rented, the stabilization equipment.  Clarinet argues that this exclusion is inapplicable because although the costs arose from property it owned and property it rented, the costs were ultimately incurred to prevent damage to City property.

The parties dispute the holding of <u>Castle Village Owners Corp. v. Greater New York Mutual Insurance Co.</u>, 64 A.D.3d 44 (N.Y.A.D. 2009).  In <u>Castle Village</u>, the court addressed whether an "owned property" exclusion that expressly excluded costs incurred to prevent damage to third-party property precluded coverage of costs incurred by the insured to stabilize, repair, and rebuild its collapsed retaining wall.  <u>Castle Village</u>, 64 A.D.3d at 45-47.  The court recognized that "[t]here are . . . circumstances where an 'owned property' exclusion may not be enforceable because of a legal obligation to prevent damage to another's property" and that whether the exclusion is enforceable depends on "the

---

[3](...continued)
whether Clarinet's duty to prevent damage to third-party property made it "legally obligated" to incur the costs.

nexus between the condition of the insured's property and the existence of ongoing and immediate harm to the property of others." Id. at 48, 51. "Where the harm cannot be cured without performing work on the insured's property, the exclusion is not applicable[;] where the immediate danger has been corrected, the restorative work to the insured's property will not be covered."[4] Id. at 51. The court summarized that "work on the insured's property which is necessary to cure (as opposed to prevent) imminent and recurring damage to adjoining property falls outside the exclusion." Id. Because the immediate danger to third-party property had been corrected by initial stabilization efforts, the "owned property" exclusion precluded coverage of subsequent ameliorative repairs. Id.

Other courts have reach differing conclusions. Compare Aetna Cas. & Sur. Co. v. Dow Chem. Co., 28 F. Supp. 2d 448, 454 (E.D. Mich. 1998) ("[A]n insured need not show actual damage to avoid the owned property provision, so long as the insured can establish the need for remediation to prevent imminent harm to a third party.") and Aetna Ins. Co. v. Aaron, 685 A.2d 858, 864 (Md. Ct. App. 1996) ("[I]n order to protect third-party property from imminent harm, the overwhelming weight of authority favors coverage under such liability policies for remediation expenses incurred in connection with an insured's own property, notwithstanding an owned property exclusion, where the concern is primarily addressed to the premises of a third party.") with Watertown Tire Recycles, LLC v. Nortman, 327 Wis. 2d 800, 2010 WL 2403094, at *4 (Wis. Ct. App. 2010) (unpublished table decision) (holding that the "owned property" exclusion containing a clause excluding costs incurred to prevent damage to third-party property was not subject to an exception for costs incurred to prevent damage to third-party property).

---

[4] The court did not explain the differences between work done to cure imminent damage and work done to prevent imminent damage.

Because the Supreme Court of Missouri has not addressed this issue,[5] the court looks to similar Missouri Supreme Court and Missouri Court of Appeals decisions to predict how the Missouri courts would rule. Eubank v. Kansas City Power & Light Co., 626 F.3d 424, 427 (8th Cir. 2010). Missouri courts have consistently stated that "[i]f the policy is unambiguous, it [must] be enforced according to its terms." Schmitz v. Great Am. Assur. Co., 337 S.W.3d 700, 705-06 (Mo. 2011) (en banc). Missouri courts "give meaning to all terms and, where possible, harmonize those terms in order to accomplish the intention of the parties." Macheca Transp. v. Philadelphia Indem. Ins. Co., 649 F.3d 661, 669 (8th Cir. 2011) (applying Missouri law).

Here, the Policy expressly precludes coverage of costs related to the insured's own property when the costs are incurred "for any reason, including prevention of injury to a person or damage to another's property." (Doc. 41-3 at 18, 21.) Given this unambiguous Policy language, Missouri courts would likely enforce the "owned property" exclusion according to its plain terms, thereby excluding from coverage costs incurred to mitigate damage to third parties.

This conclusion is consistent with the Policy as a whole because even if mitigation expenses are not generally excluded from coverage, the stabilization and demolition costs are nonetheless excluded. The Policy contains a "vacant building" exclusion,[6] which precludes coverage for

---

[5]Nor is this issue controlled by Slay Warehousing Co., Inc. v. Reliance Ins. Co., 471 F.2d 1364 (8th Cir. 1973). The policy at issue in Slay contained a clause requiring the insured to protect, safeguard, and salvage the property. 471 F.3d at 1367. Absent such a provision, the court is not persuaded that Slay demands coverage of the mitigation expenses incurred by Clarinet here. See Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1057-58 (recognizing this distinction). Moreover, the Policy expressly *excludes* from coverage costs incurred in the "prevention of . . . damage to another's property." (Doc. 41-3 at 18, 21.)

[6]Clarinet's argument that this exclusion would effectually deny all coverage is unavailing, as the exclusion is limited to costs arising from renovation, demolition, and construction operations of the building. See, e.g., Saiz v. Charter Oak Fire Ins. Co., 299 F. App'x 836, 839-40 (10th Cir. 2008) (holding that "vacant building" exclusion precluded
(continued...)

those "costs . . . arising from any renovation, demolition, or construction operations . . . at any building, or part of a building, classified . . . as vacant." (Doc. 41-3 at 17.) Because the Switzer Building was vacant[7] and the property damage arose from the stabilization and demolition of the vacant Switzer Building, the stabilization and demolition costs would not be covered by the Policy. See Spirtas Co. v. Fed. Ins. Co., 521 F.3d 833, 835-37 (8th Cir. 2008) (applying Missouri law and reasoning that "arising from" should be construed broadly).

Similarly, the Policy states that "[n]o insured will, except at that insured's own cost, voluntarily make a payment,[8] assume any obligation, or incur any expense, other than for first aid, without our consent."[9] (Doc. 41-3 at 26, 27) (emphasis added). Clarinet concedes that it did not attempt to obtain Essex's consent prior to incurring the stabilization and demolition costs. "In Missouri, the purpose of notice provisions in insurance policies is to prevent prejudice to the insurer, not to provide a technical escape hatch by which to deny coverage in the absence of prejudice." Billings Mut. Ins. Co. v. Cameron Mut. Ins. Co., 229 S.W.3d 138, 148 (Mo. Ct. App. 2007). Clarinet's failure to notify or at least attempt to obtain consent from Essex prejudiced Essex in that Essex was foreclosed from investigating the extent of damage to the Switzer Building, the need for stabilization and/or demolition prior to

---

[6](...continued) coverage for water damage to vacant building caused by defective sprinkler heads); Gas Kwick, Inc. v. United Pacific Ins. Co., 58 F.3d 1536, 1540 (11th Cir. 1995) (enforcing "vacant building" exclusion and rejecting argument that the insurer could not issue a policy on a vacant building and then exclude it from coverage on the basis of vacancy).

[7]The parties agree that the Switzer Building was vacant. (Doc. 43 at ¶ 12.)

[8]Essex also argues that the costs are not covered because Clarinet voluntarily agreed to incur the costs. Because there are fact disputes concerning whether the City ordered Clarinet to take action, summary judgment is not appropriate on this ground. (Doc. 44-1 at ¶¶ 26, 33.)

[9]That the Policy required Clarinet to first obtain Essex's consent is also contrary to the presumption in Slay, that "the assured is acting at the insurance company's request." Slay, 471 F.2d at 1367.

demolition, or seeking more favorable demolition or stabilization contract terms. See Interstate Cleaning Corp. v. Comm. Underwriters Ins., 325 F.3d 1024, 1030 (8th Cir. 2003) (applying Missouri law and holding that the insured's failure to notify the insurer of the lawsuit until after the jury rendered a verdict deprived the insurer of the opportunity to investigate facts, to defend on liability, to settle the lawsuit, and to choose a trial strategy); Johnston v. Sweany, 68 S.W.3d 398, 402-03 (Mo. 2002) (en banc) (holding that the insurer was prejudiced by the insured's late notice in that the insurer was deprived of its opportunity to investigate facts, settle a lawsuit before trial, defend against liability at trial, and dispute the amount of damages).

In Slay, the Eighth Circuit recognized that "[every] case must be examined in light of the specific insuring agreement and the law of the particular jurisdiction." Slay Warehousing Co., Inc. v. Reliance Ins. Co., 471 F.2d 1364, 1367 (8th Cir. 1973). Given the number of unambiguous applicable exclusions,[10] the Policy cannot be construed to provide coverage for the stabilization and demolition costs, even if those costs were incurred to prevent further damage to third-party property.

Clarinet also argues that Essex's refusal to pay was without reasonable cause or excuse. See D.R. Sherry Constr., Ltd. v. Am. Fam. Mut. Ins. Co., 316 S.W.3d 899, 907 (Mo. 2010) (en banc) (setting forth the elements of a claim for vexatious refusal to pay). "An insurer is permitted to question or contest its liability if it has reasonable cause to believe, and does believe, that it has no liability under the policy and that it has a meritorious defense." Legg v. Certain Underwriters at

---

[10]Essex also argues that the "expected damages" exclusion, which excludes coverage for property damage that is "expected or intended from the standpoint of the insured," applies. (Doc. 41-3 at 18.) Because this exclusion is ambiguous as to when the expectation of damages is to be evaluated, i.e. at the time of entering the Policy or at the time of incurring the damages, and because the stabilization and demolition costs are excluded by other exclusions, the court declines to address the potential applicability of the "expected damages" exclusion. See, e.g., Mutual Serv. Cas. Ins. Co. v. Cty. Life. Ins., 859 F.2d 548, 552-53 (7th Cir. 1988) ("[E]ven where the damages are not accomplished by design or plan (not intended), they may be of such a nature that they should have been reasonably anticipated (expected) by the insured.").

Lloyd's of London, 18 S.W.3d 379, 387 (Mo. Ct. App. 1999).  Essex's determination that the stabilization and demolition costs were not covered by the Policy was not unreasonable.  See generally Wunsch v. Sun Life Assur. Co. of Canada, 92 S.W.3d 146, 154 (Mo. Ct. App. 2002). Moreover, that Essex's denial of coverage was proper "belies a contention that it did not have a meritorious reason for refusing to pay" the costs. Marcomb v. Hartford Fire Ins. Co., 934 S.W.2d 17, 20 (Mo. Ct. App. 1996); accord Hite v. Am. Fam. Mut. Ins. Co., 815 S.W.2d 19, 23 (Mo. Ct. App. 1991).  Therefore, Essex is entitled to summary judgment on Clarinet's vexatious refusal to pay claim.

## VI.  CONCLUSION

For the reasons discussed above, the motion of plaintiff Clarinet, LLC for summary judgment (Doc. 37) is denied and the motion of defendant Essex Insurance Company (Doc. 40) for summary judgment is sustained.

An appropriate Judgement Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 23, 2012.